[No. 35229-6-I.   Division One.   May 30, 1995.]

CONCERNED CITIZENS OF HOSPITAL DISTRICT NO. 304, *Appellant*, v. BOARD OF COMMISSIONERS OF PUBLIC HOSPITAL DISTRICT NO. 304, ET AL., *Respondents.*

334

*William Stiles, Jr., Wade R. Dann, Linda Dann Fleming* and *Bill H. Williamson*, for appellant.

*Thomas Ahearne, Colonel F. Betz, Sheila C. Ridgeway, Karen J. Boyle* and *Brad Furlong*, for respondents.

COLEMAN, J. — Concerned Citizens of Hospital District 304 appeals the trial court's grant of summary judgment in favor of the boards that govern and operate two public hospitals. Concerned Citizens argues that the trial court improperly awarded summary judgment because the hospital boards (1) unlawfully spent bond proceeds, (2) breached a contract with Concerned Citizens, (3) are equitably estopped from terminating services, (4) violated the State Environmental Protection Act (SEPA), (5) acted in an arbitrary and capricious manner, and (6) violated Concerned Citizens' civil rights. We affirm.

This case arises from the hospital boards' decision to offer acute and emergency medical services exclusively at one hospital, terminating these services at another hospital. The hospitals are approximately nine miles apart. The first hospital, Skagit Valley Hospital, serves the Mount Vernon area and was operated originally by Public Hospital District 1 (PHD 1). Public Hospital District 304 (PHD 304) operated the other, United General Hospital, in Sedro Woolley to serve that city and some of the more rural areas of Whatcom and Skagit counties. Each hospital was governed by an elected five-member board of commissioners and administered by a superintendent. In 1990, PHD 1 and PHD 304 formed Affiliated Health Services and agreed to operate their hospitals jointly. The affiliation agreement states:

> The District Boards recognize the present need for emergency services and certain acute care services to continue to be offered at both locations. The Joint Operating Board shall be responsible for determining . . . the service location or locations for each healthcare and support service[.]

The Joint Operating Board is composed of the PHD 1 Board of Commissioners, the PHD 304 Board of Commissioners, and the superintendent, Patrick Mahoney.

In early 1991, Affiliated Health Services contracted with Ernst & Young to review its hospital operation. The consultants recommended that acute and emergency care be terminated at United General Hospital and consolidated at Skagit Valley Hospital. To fight this recommendation, residents of PHD 304 formed Concerned Citizens of Hospital District 304. Concerned Citizens approached the PHD 304 Board with a petition asking that no services be moved to Skagit Valley Hospital without a vote of the district electorate. The PHD 1 Board, the PHD 304 Board, and the Joint Operating Board decided to attempt to retain acute and emergency care services at United General for as long as practicable. To accomplish this they determined that United General required certain capital improvements. The PHD 304 Board adopted Resolution

871, approving a November 1991 ballot measure that, if passed, would authorize a bond issue to fund the following projects: (1) buying and installing a computerized tomography scanner and a linear accelerator; (2) building a new emergency room, fire protection system, and heating, cooling, and ventilation system; and (3) converting the existing emergency room to outpatient services.

The PHD 304 Board clarified its position regarding the proposed bond issue in Resolution 877.

> In the event capital equipment purchases are made and located on the United General Hospital campus but shared by both campuses, the United General Hospital share of the cost of that equipment will be approved by the District #304 Board of Commissioners.
>
> . . . .
>
> We intend to maintain acute care medical services at United General Hospital for the foreseeable future, including the following:
>
> 1. Emergency services
>
> . . . .
>
> 6. Critical Care Unit (ICU/CCU)
>
> . . . .
>
> In the event that consideration is given by the Joint Operating Board of Affiliated Health Services to the possible elimination of any major service at United General Hospital, including those listed above, the Board will release advance public notice of this intent. Public input from Hospital District #304 consumers will be welcome at open board meetings prior to a vote by District #304 Commissioners on any such decision.

After the voters approved the ballot measure, the PHD 304 Board issued bonds and began the improvements.

In March 1993, out of concern generated by market and regulatory changes, the Joint Operating Board hired another consultant, the Hunter Group. While the Hunter Group conducted research and interviews, the Joint Operating Board held public meetings to discuss the pos-

sibility of consolidating hospital services. Two months later, the Hunter Group presented its findings to the Joint Operating Board at a public meeting. The report was pessimistic about the future financial viability of two full-service hospitals in close proximity, noting the increasing emphasis on managed care and the passage of Washington's health care reform legislation. The Hunter Group therefore recommended that some services remain available at both hospitals but that all acute and emergency care should be located at Skagit Valley while utilizing United General for outpatient and specialty services. Under the Hunter Group's proposal, Skagit Valley would remain a 24-hour facility and United General would staff an urgent care unit between 10 a.m. and 10 p.m. daily. On May 17, the Joint Operating Board's Planning and Facilities Committee recommended that the Hunter Group's proposals be accepted. At a public meeting one week later, the Joint Operating Board voted unanimously to accept the consolidation recommendation.

The hospital boards notified Concerned Citizens directly of its meetings and made "board books" available to the group before each meeting. Board books contain a meeting's agenda, a summary of items for discussion, previous minutes, and recommendations and reports from various committees. After consolidation was approved, task forces met in public meetings to work out the details. At least one member of Concerned Citizens was a member of these task forces.

By the time the consolidation was approved, most of the bond-funded projects at United General had been completed. Two projects remained: improving the heating and ventilation system, and renovating the existing emergency room. In light of the approved consolidation, the Joint Operating Board decided not to spend any further bond money on the uncompleted projects. A supplemental fund was created to help retire the bonds with the unspent bond proceeds.

The first physical steps to accomplish the consolidation

were planned for the first week in October 1993. On Friday, October 1, Concerned Citizens filed a complaint for declaratory and injunctive relief against the Boards of Commissioners of PHD 1 and PHD 304, the Joint Operating Board, and superintendent Mahoney. The hospital boards filed a cross-motion for summary judgment, which the trial court granted. The Washington Supreme Court denied direct review.

■■ The appellate court reviews a summary judgment by engaging in the same inquiry as the trial court, looking at the facts submitted to the trial court in the light most favorable to the nonmoving party. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). For summary judgment to be proper, the facts must demonstrate that no genuine issue as to any material fact exists and that the moving party is entitled to judgment as a matter of law. CR 56(c); *Wilson*, at 437.

We first consider whether PHD 304 unlawfully spent bond proceeds. Concerned Citizens argues that PHD 304 needed voter approval to retire the bonds without completing all of the proposed projects.

■■ ■ Concerned Citizens correctly contends that a governing body may not spend bond money raised for a designated purpose for a purpose not approved by the voters. *See generally King County. v. Taxpayers*, 104 Wn.2d 1, 6, 700 P.2d 1143 (1985); *O'Byrne v. Spokane*, 67 Wn.2d 132, 136-37, 406 P.2d 595 (1965); *George v. Anacortes*, 147 Wash. 242, 265 P. 477 (1928); *Hayes v. Seattle*, 120 Wash. 372, 374-75, 207 P. 607 (1922). However, local governments are not required to complete a project exactly as approved and may abandon a project in the appropriate circumstances. *See Hayes*, at 376 (within City's discretion not to expend bond money on some of the proposed improvements); *George*, at 245-46. In *George*, the court stated that, while city officers are not allowed to change approved actions at their will, "[m]any situations might arise after approval that would make it unwise for the city to proceed with a project, and abandonment might be a proper action

to take". *George*, at 245. Similarly, once a bond-funded improvement is constructed, the government is not required to continue operating it as originally planned. *See Moses Lake Sch. Dist. 161 v. Big Bend Community College*, 81 Wn.2d 551, 556-57, 503 P.2d 86 (1972) (holding constitutional a state statute under which local school district transferred community college, built with general obligation bond money, to the state). *See also Wheeler v. DeKalb County*, 249 Ga 678, 292 S.E.2d 855, 858-59 (1982) (senseless to require buildings continued use for original purpose when no longer needed for that purpose); *Silverman v. Board of Educ.*, 339 A.2d 233, 237-38 (N.J. Super. Ct. Law Div.), *aff'd* 346 A.2d 611 (N.J. Super. Ct. App. Div. 1975).

██ Thus, the PHD 304 Board acted within its authority when it decided to retire the bonds instead of completing all of the approved capital improvements in the face of changing economic and regulatory circumstances. The fact that voter-approved bonds financed the new emergency room's construction does not prevent subsequent adjustment in the room's use to an urgent care center.

██ ██ We next address whether PHD 304 breached a contract with Concerned Citizens. To form an express contract, the parties must express their intentions and the terms of their agreement, either orally or in writing, at the time they enter into the contract. *Eaton v. Engelcke Mfg., Inc.*, 37 Wn. App. 677, 680, 681 P.2d 1312 (1984) (citing 1 Samuel Williston, *Contracts* § 3 (3d ed. 1957)). The parties' intentions are determined from the reasonable meaning of their words and acts. *Multicare Medical Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 586-87, 790 P.2d 124 (1990). Concerned Citizens argues that the PHD 304 Board entered into a written or oral contract with them to continue acute care services at United General for at least as long as the life of the bond issue. Concerned Citizens contends that the ballot measure, Resolutions 871 and 877, and its correspondence with the PHD 304 Board constitute a written contract. We find

that the words and actions of the PHD 304 Board do not manifest an intent to enter into such a contract with Concerned Citizens.

■ The ballot measure by itself does not constitute a written contract. *See Noah v. State*, 112 Wn.2d 841, 843-44, 774 P.2d 516 (1989) (statute not a contract when subject to future amendments and repeals and when no legislative intent to create contractual rights). Resolution 877 expressly acknowledges the possibility that major services, including acute and emergency care services, could be eliminated at United General. The resolution also warns that acute and emergency care services would remain at United General for only the "foreseeable future" and lists the actions the PHD 304 Board would take in the event that the Joint Operating Board considered terminating those services. These writings do not support the argument that the PHD 304 Board intended to enter into a contract to continue to provide emergency and acute care services for any length of time. Concerned Citizens offers no evidence to support its assertion that it entered into an oral contract with the PHD 304 Board. Therefore, no written or oral contract existed between the PHD 304 Board and Concerned Citizens.

■ ■ We turn now to the question of whether respondents are equitably estopped from terminating acute and emergency care services at United General. To apply equitable estoppel, a party must present clear, cogent, and convincing evidence of: (1) an admission, statement, or act inconsistent with a claim afterwards asserted; (2) action by another in reasonable reliance on the act or statement; and (3) injury to the relying party if the other party is allowed to contradict the prior act, statement, or admission. *Robinson v. Seattle*, 119 Wn.2d 34, 82, 830 P.2d 318, *cert. denied*, 113 S. Ct. 676 (1992); *Board of Regents v. Seattle*, 108 Wn.2d 545, 551, 741 P.2d 11 (1987). Equitable estoppel is not favored and will be applied against state or local governments only when necessary to prevent a manifest injustice, and the exercise of

governmental powers will not thereby be impaired. *Shafer v. State*, 83 Wn.2d 618, 622, 521 P.2d 736 (1974); *Concerned Land Owners of Union Hill v. King County*, 64 Wn. App. 768, 777, 827 P.2d 1017, *review denied*, 119 Wn.2d 1008 (1992).

Concerned Citizens posits that it reasonably relied on Resolution 877 and the ballot measure as statements that emergency and acute care services would not be terminated at United General, at least for the life of the bonds. We find that Concerned Citizens fails to establish a genuine issue of material fact as to the elements of its equitable estoppel claim. Concerned Citizens provides no evidence to support the proposition that it reasonably relied on statements inconsistent with later acts.

As noted above, Resolution 877 expressly states that termination might be considered in the future; this statement is consistent with later consideration and adoption of a plan to terminate acute and emergency services. Further, Concerned Citizens' claimed injury, continued payment on the bonds, does not appear actionable. *See Moses Lake Sch. Dist. 161 v. Big Bend Community College, supra.* Moreover, imposing estoppel in this case would impair the exercise of governmental powers. The hospital districts faced a difficult decision necessitated by financial conditions. To force the districts to continue to operate United General as a 24-hour facility would interfere with their authority to decide how to provide health care services within their service areas. The affiliation agreement specifically authorizes the Joint Operating Board to determine the service location or locations for each healthcare and support service. *See* RCW 70.44.003, .007, .060 (powers and duties of public health districts); *Cf. Litz v. Pierce County*, 44 Wn. App. 674, 683-84, 723 P.2d 475 (1986) (county could not be forced to continue certain ferry service schedule). For these reasons, the hospital boards are not equitably estopped from terminating certain services at United General.

██ We next address whether the consolidation plan

was implemented in violation of the State Environmental Policy Act of 1971 (SEPA). Under SEPA, governments of this state must include an environmental impact statement in every recommendation or report on "major actions significantly affecting the quality of the environment". RCW 43.21C.030(2)(c). Analysis of environmental concerns encompasses elements of the "built" environment, including public services and utilities such as water, sewer, schools, and fire and police protection. RCW 43.21C.110(1)(f); WAC 197-11-444(2)(d). This appears to include public hospital services.

Concerned Citizens argues, under *Noel v. Cole*, 98 Wn.2d 375, 655 P.2d 245 (1982), that the consolidation of services constitutes an ultra vires action because the Joint Operating Board did not first complete an environmental impact statement. Concerned Citizens asserts that the Joint Operating Board should have assessed the following potential impacts on public hospital service: loss of existing acute and emergency room services, increased response time for emergency medical teams, reduced property values in the area of United General, and shift in population toward Skagit Valley as area residents seek improved accessibility to available services.

The PHD 304 Board was not required to complete an environmental impact statement to assess these "impacts". Concerned Citizens cites no authority that has subjected such alleged impacts to environmental review. *See Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 344, 552 P.2d 184 (1976) (no factual connection between alleged condominium project and construction of urban arterial; remote impacts need not be considered under SEPA); *SEAPC v. Cammack II Orchards*, 49 Wn. App. 609, 615-16, 744 P.2d 1101 (1987) (property values exempt from consideration of adverse impacts on built environment).

In addition, the hospital boards argue that the consolidation plan is exempt from having to conduct an environmental impact statement. Under WAC 197-11-800(15), the following agency actions are exempt from SEPA review:

(a) The procurement and distribution of general supplies, equipment and services authorized or necessitated by previously approved functions or programs.

. . . .

(g) All personnel actions, including hiring, terminations, appointments, promotions, allocations of positions, and expansions or reductions in force.

(h) All agency organization, reorganization, internal operational planning or coordination of plans or functions.

. . . .

WAC 197-11-800(15). Concerned Citizens contends that these exemptions apply only to actions of a single agency, not to consolidation approved and implemented by the Joint Operating Board.[1] We see no merit in drawing such a distinction and find that the Joint Operating Board's actions to consolidate some hospital services qualify for these exemptions. The consolidation entails agency reorganization, internal operational planning, and coordination of functions. The boards of PHD 1 and 304 agreed to work together to operate the hospitals, including consolidation of services, under the aegis of a joint board. This type of cooperative action is authorized by statute. RCW 70.44.240. Thus, the statute exempts the hospital board's consolidation plan and no environmental impact statement was needed.

We next consider whether the hospital boards provided adequate notice of their actions. Concerned Citizens argues that the hospital boards failed to follow statutory notice and hearing procedures for consolidating hospital districts

---

[1]Concerned Citizens further argues that, even if the plan is exempt, the court may look behind the facial exemptions and require an environmental review under *Noel*, at 380 n.2 and *Downtown Traffic Planning Committee v. Royer*, 26 Wn. App. 156, 164-65, 612 P.2d 430 (1980). These cases were decided under an earlier law and suggest that categorical exemptions may be denied in some cases on the basis of individual circumstances and critical judicial review. At least one recent case indicates that this approach is no longer appropriate. *See Snohomish County v. State*, 69 Wn. App. 655, 666-69, 850 P.2d 546 (1993) (amended statute gives DOE responsibility to classify exempt actions so other agencies may rely upon the rules that DOE adopts), *review denied*, 123 Wn.2d 1003 (1994).

as provided for in RCW 70.44.190. This argument is without merit. PHD 1 and PHD 304 did not consolidate their districts; they merely agreed to jointly operate their facilities. Concerned Citizens also contends that the hospital boards violated the Open Meetings Act when it adopted the Hunter Group's recommendation. Under that act, when public boards adopt resolutions, rules, and directives, they must do so at public meetings, either regularly scheduled meetings or meetings for which notice is given. RCW 42.30.010, -.060. Notice must include the time and place of the meeting and the business to be transacted. *See* RCW 42.30.080.[2] The record simply does not support Concerned Citizens' contention that the notice given by the hospital boards failed to include the nature and purpose of the meetings.

We next decide whether the hospital boards took illegal or arbitrary and capricious action. Concerned Citizens' assertion that its members were not permitted any input or testimony regarding the proposed consolidation, as required by Resolution 877, is unconvincing. The hospital boards solicited public comment during meetings in March and May, and the Hunter Group conducted 166 interviews, including some with Concerned Citizen members. One Concerned Citizens member acknowledged this, stating that the public was allowed to make public comments and ask questions in "numerous public meetings".

Concerned Citizens challenges the legality of superintendent Mahoney's participation in the Joint Operating Board's vote to accept the consolidation recommendation, under RCW 70.44.080(1). This argument is meritless. Under that statute, superintendents of public health districts are entitled to attend meetings of public health districts and participate in discussions but must not vote. The statute does not apply to meetings of the Joint Operat-

---

[2]The statute requires that notice for special meetings be given to each member of the agency holding the meeting. Notice must also be given to each local newspaper and local radio and television station that has requested such notice. RCW 42.30.080.

ing Board, which administers a joint undertaking and not a public health district.

Similarly unconvincing is Concerned Citizens' argument that the superintendent violated the separation of powers doctrine when he voted as a member of the Joint Operating Board to approve consolidation. Under the separation of powers doctrine, the officers of one branch of government are not permitted to usurp or exercise the powers of another branch, although some overlapping of functions necessarily results. *In re Salary of Juvenile Director*, 87 Wn.2d 232, 240-42, 552 P.2d 163 (1976). Concerned Citizens fails to suggest how the present facts implicate the separation of powers doctrine; as respondents note, the consolidation entailed solely administrative decisions.

Concerned Citizens also argues that the board's action was arbitrary and capricious. Arbitrary and capricious action is " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous' ". *Kendall v. Douglas, Grant, Lincoln, & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991) (quoting *Abbenhaus v. Yakima*, 89 Wn.2d 855, 858-59, 576 P.2d 888 (1978)). Courts will not review the discretion vested in public officers except in cases of clear abuse. *Kendall*, at 14. Concerned Citizens fails to provide any support for its contention that approving consolidation of services after extensive deliberation and public meetings constituted arbitrary and capricious action.

We last address whether the consolidation plan violates Concerned Citizens' civil rights. Under 42 U.S.C. § 1983, a plaintiff must show that some person deprived him or her of a federal constitutional or statutory right while acting under color of state law. *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 11, 829 P.2d 765, *cert. denied*, 113 S. Ct.

676 (1992). Concerned Citizens argues that the consolidation plan wrongfully took its members' contract rights to continued acute and emergency care at United General and denied them procedural and substantive due process. As discussed above, no contract existed between the PHD 304 Board and Concerned Citizens, and thus, Concerned Citizens has no property right to continued acute and emergency services at United General. *Cf. Jackson v. New York City Health & Hosps. Corp.*, 419 F. Supp. 809, 812 (S.D.N.Y. 1976) (access to medical care at a particular location or to particular kind of medical care is not a constitutionally protected right). Without implication of a federal constitutional or statutory right, Concerned Citizens' civil rights claim fails.

For the reasons stated, we find that the trial court properly granted summary judgment in favor of the hospital boards. Because we find that Concerned Citizens does not demonstrate any genuine issues of material fact, we need not address respondents' arguments that Concerned Citizens' suit is barred by the doctrine of laches and that Concerned Citizens abandoned its estoppel, contract, writ, and civil rights claims in the trial court.

Both the hospital boards and Concerned Citizens claim they are entitled to attorney fees and costs. As it did not prevail on appeal, Concerned Citizens is not entitled to attorney fees. The hospital boards request attorney fees primarily on the assertion that Concerned Citizens' claims are frivolous and advance no rational argument based on law or fact. We do not find Concerned Citizens' action so devoid of merit as to justify an award of attorney fees on appeal.

The order of summary judgment is affirmed.

BAKER, C.J., and KENNEDY, J., concur.

Review denied at 127 Wn.2d 1024 (1995).